UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>            Plaintiff,              )<br>                                         )<br>            v.                             )<br>                                         )<br>MARY ELLEN LABRECQUE,  )<br>    a/k/a ELLEN LABRECQUE  )<br>            Defendant.              )<br>_____) | CR No. 03-CR10381 NG |

**DEFENDANT'S SENTENCING MEMORANDUM**

The defendant has pled guilty to a one count Information charging her with theft of $22,164 in Social Security disability benefits. The Probation Office has computed her Total Offense Level under the Sentencing Guidelines as Level 8. Both the government and the defendant agree with this assessment. With that level, the Guidelines advise a sentence of between 0 and 6 months.

Defendant suffers from serious long-term mental and other health issues, principally bi-polar disorder, which led, in the first place to her disability finding – (the correctness of which has never been in issue), then to her commission of this crime, and finally, to this prosecution, which has devastated her. Her arrest led to a serious suicide attempt, to the immediate loss of her job, and of the home and life she had begun in the United Kingdom, and to her suspension from the practice of law. She has pled guilty because she recognizes the wrongfulness of her conduct, accepts responsibility for it, desires to make full restitution, and hopes to begin the difficult process of rebuilding her life. She requests the Court's assistance in accomplishing this objective, by imposing a sentence of restitution, no incarceration, and conditions of probation which permit her to regain her footing. Such a sentence would not only be consistent with the Guidelines, but with all of the factors set forth in 18 U.S.C. §3553(a).

**The Offense Conduct**

The defendant, Ellen Labrecque, has suffered from severe bi-polar disorder for approximately 30 years. She was first diagnosed with the condition in the late 1970's. In 1994, after her condition had deteriorated, she applied for Social Security disability, and was awarded disability benefits in 1996.[1]

Under the Social Security Disability program, a beneficiary may work up to nine months in a "Trial Work Period," without affecting eligibility. In February 2001, Ms. Labrecque began work at the Massachusetts Department of Environmental Protection, as an independent contractor with no benefits.[2] She believed that this was the beginning of the trial work period.[3]

By November 2001, defendant's trial work period – as she understood it – had expired. However, desperate to retain her ability to pay for medical insurance and medications, operating

---

[1] It has not been disputed that she suffers from this condition. No part of the charges against her is based on any claim that she does not have this underlying disabling disease.

[2] As a result, she used her correct Taxpayer Identification number in filling out Human Resources forms. Later, this was mistakenly interpreted as a false Social Security number, causing the initiation of the investigation which eventually led to this prosecution.

[3] As it happens, defendant was not entitled to a trial work period at this time, but she did not realize this. Under the Social Security program, there are two ways that one can work and not have it affect one's eligibility. Any work that one performs which does not amount to "substantial gainful activity"("SGA") – which is defined as a certain amount per month – does not affect one's status. The other method is the "trial work period," discussed above. The trial work period does not depend on the amount earned – one can earn any amount, no matter how high, and it will not affect eligibility; however, a lower amount earned – (even if lower than the SGA amount) – can count toward using up the trial work period. Ms. Labrecque had worked in 1996, 1997, and 1999, but this work did not qualify as "substantial gainful activity." For this reason, she mistakenly believed that it did not affect the trial work period. In fact, it used up that period. Thus, in computing what is due to the government in overpayments, defendant has agreed that she owes $34,808.00, in money she was not eligible to receive. However, she did not knowingly become ineligible until November 2001, and thus the amount attributable to criminal conduct is $22,164.00, as alleged in the Information.

with compromised focus and judgment because of her underlying disease, and overwhelmed by a host of family and other health problems, she failed to make an accurate report of her financial circumstances to Social Security – and thus was continued on the disability rolls.

From December 2001 onward, defendant experienced an escalating series of crises. She learned that her father was dying of inoperable brain cancer, and he died in March 2002. She was informed that the funding for her job at DEP was to be cut – leading her to fear that she could find herself without any safety net at any moment. She became involved in bitter and stressful family controversies – over her sister's custody of her children, her sister's care for her father, and over the disappearance of all of her father's assets. At the same time, she was suffering from bi-polar episodes, and she was advised that she was at risk for recurrence of breast cancer.[4]

Dr. Bennett, defendant's long-time psychiatrist, in his September 29 letter (attached as Exhibit A), focuses directly on the period during which the offense took place, which was while she was under his treatment:

> Ms. LaBrecque's mood swings had been relatively stable for several years prior to that period, but at that time she began to experience severe, brief periods of depression with suicidal ideation. She was intensely anxious and afraid of harming herself and falling apart. We started to meet weekly rather than, as before, every 3 months. Possible precipitants included menopause and a family conflict brought on by her father's impending death, her sister's misappropriation of his assets, and Ms. LaBrecque's siblings' condemning her despite her having protected them, during childhood, from their father's violence. We were unable to control these depressive episodes with medication changes. Her lithium level behaved unpredictably and antidepressants were ineffective and/or threatened to precipitate mania. In the end, she

---

[4] She had been diagnosed in 1998, and treated through 1999.

>elected to begin estrogen treatment, despite the high risk of
>recurrent breast cancer, because it was the only thing that
>stabilized her.  She was desperately afraid of being hospitalized for
>depression and of becoming destitute from the medical cost of
>severe illness.

Finally, in July she obtained a job in London, as a teacher, and she left the country in August 2002.  As Dr. Bennett has pointed out, Ms. Labrecque's "ebullience and nurturing qualities made her a natural teacher."  (Letter of September 1, 2005, attached to PSR).  Once in England, she faced the rigors and stresses of creating a new home and starting a new career, alone and abroad.  Still, the distressing family battles continued, even at long distance.  And she had continuing, cancer-related medical issues.  She concentrated on stabilizing her mental and physical health situation.  But her new circumstances offered new hope for a long-term, stable existence.  "For the first time in may years, it looked like she would soon be able to restore her finances while securing the necessary amount of medical insurance."  Id.   She taught at the University of London, School of Oriental and African Studies.  She was an inspiring, devoted, attentive, accessible – and in return beloved – teacher to students, most of whom were immigrants and many of whom were in need of the individual care defendant was happy to provide.  For the next year, she put her Social Security status out of mind, and to the extent she focused on it at all, she told herself that she would deal with it at a later time.

In the meantime, in or about May 2002,  the inconsistency in defendant's identification numbers on with the Social Security Administration file  – discovered in a computer match (see note 2, supra) -- resulted in a referral for criminal investigation.  Ultimately, as a result of the investigation, defendant's disability payments were terminated in June 2003.

Thereafter defendant was indicted December 2003, and on July 1, 2004, she was arrested

while on a visit from Great Britain.  During her 24 hour incarceration incident to the arrest, all of the defendant's medications were removed.   This had very harsh consequences.  Within two days she made a serious suicide attempt.   Defendant's own description of this episode is attached as Exhibit B.  The arrest was accompanied by publicity, and she immediately lost her job.  And, as a result of the prosecution, she could not return to England – and the serious relationship she had begun with a man was disrupted and withered.  She has been temporarily suspended from the practice of law.[5/]  She is, once again, unemployed and unemployable.

Altogether, she wrongfully received 20 monthly payments, for a total of $22,164.00.

## The Appropriate Sentence

It is clear that nothing in the nature of the offense, the history and characteristics of the defendant, or any of the other factors listed in 18 U.S.C. 3553(a) call for any greater sentence than the probationary sentence she requests.  Indeed, even if the Guidelines had specified a higher sentencing range, the Guidelines themselves would have warranted a departure to a non-incarceration sentence.  Defendant presents a classic case of diminished capacity, within the meaning of USSG §5K2.13, since the defendant "committed the offense while suffering from a significantly reduced mental capacity."

As attested by the letters from her friends (Exhibit C) and the evaluations of her long-term physician, defendant is a fundamentally honest, trustworthy and good-hearted person.  Her offense was very much a product of her problematic and demoralizing situation, with her judgment compromised by illness.  In her life, from childhood on, she has confronted, and

---

[5/] Upon her voluntary temporary suspension and plea of guilt, the SJC referred defendant's case to the Board of Bar Overseers, which will now determine whether she will be disbarred or receive a term suspension.

overcome, daunting challenges with great courage.  But this case has brought her to perhaps her lowest point.  Thus, her wrongful conduct has harmed no one so much as herself.

Yet, by pleading guilty and accepting responsibility, defendant has turned a corner.  She has faced up to what she did and agreed to make full restitution.  Her conviction and sentencing permitting, she hopes to return to teaching, to return to Great Britain, and to begin rebuilding her life once again.

>Respectfully submitted,
>
>_____
>Max D. Stern
>BBO No. 479560
>Stern, Shapiro, Weissberg
> & Garin, LLP
>90 Canal Street, Suite 500
>Boston, MA 02114-2022
>(617) 742-5800

Dated:  October 3, 2005.